J-S08030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: S.M.C. (7/7/04), D.K.C. (12/12/06), AND J.M.C. (7/28/05), MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.C., | No. 1325 WDA 2015 |

Appeal from the Order entered July 29, 2015,
in the Court of Common Pleas of Somerset County, Orphans'
Court, at No(s): 27, 27A, 27B Adoption 2014

BEFORE:  STABILE, J. DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                    **FILED MARCH 22, 2016**

T.C. ("Mother") appeals from the Order entered by the Somerset Court of Common Pleas on July 29, 2015, granting Maternal Grandparents' petition to terminate involuntarily the parental rights of Mother to her three children ("Children") pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b), and changing the Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.  We affirm.[1]

The relevant facts and procedural history of this case are as follows.

Mother lived with her mother ("Maternal Grandmother") until she was approximately 12 or 13 years old.  She left Maternal Grandmother's home after Maternal Grandmother's paramour ("Maternal Step-Grandfather") allegedly paddled her with a board.  Mother lived with her own father in North Carolina and eventually began a relationship with Children's Father.

---

[1] Father's parental rights were also involuntarily terminated. Father has not appealed that determination, and is not a subject of this appeal.

In July 2004, when she was 21 years old, Mother gave birth to S.M.C. In November 2004, Mother, Father, and S.M.C. moved back to Pennsylvania, where they resided for a couple of weeks with Maternal Grandmother, Maternal Step-Grandfather (collectively "Maternal Grandparents"), and Mother's half-sister, K.H.[2]

Mother gave birth to J.M.C. in July 2005, and D.K.C. in December 2006. Sometime in 2008, Mother and Father broke off their romantic relationship. Mother and Children lived together in an apartment until Mother was evicted sometime in 2008. She and Children then moved back in with Maternal Grandparents. Mother obtained a job and was able to purchase a mobile home. She worked evenings. Children went to day care during the day, and stayed with Maternal Grandparents when Mother was working.

In 2009, Mother broke her leg in an automobile accident and was unable to work and support herself. Children then began living full time with Maternal Grandparents. *See* N.T., 7/28/15, at 16; Trial Ct. Op., dated 10/07/15, at ¶ 50.

Mother resided with Maternal Grandparents and Children for a short time in 2011 after she broke her leg a second time, but her relationship with Maternal Step-Grandfather was strained and she moved out. Children remained with Maternal Grandparents.

---

[2] Maternal Grandmother and Maternal Step-Grandfather are not legally married but have lived together for over twenty years. K.H., Children's maternal aunt, is their child.

- 2 -

At some point, Mother obtained a new place to live and a job working in a nursing home. During this period, Mother had custody of the three children, had beds for them, clothing for them, and supplies as needed. Since 2004, in addition to occasionally residing in Maternal Grandparents' home, Mother has resided at least nine different places, including a homeless shelter. *See* Trial Ct. Op., at ¶71.

In August 2013, Maternal Grandmother filed an emergency *ex parte* Petition for Custody after Pennsylvania State Police appeared at her home looking for Mother. On August 9, 2013, the Court of Common Pleas of Somerset County held a hearing and granted primary physical custody of Children to Maternal Grandmother. The court awarded Mother partial custody on Saturdays and Sundays from 10:00 a.m. to 5:00 p.m., and such other days as mutually agreed upon by the parties. The court directed Somerset County Child Custody and Visitation Office to conduct home studies of both the home of Grandmother and the home of Mother. If Mother's home study were satisfactory, Mother would be allowed to have Children overnight. The court also found that Maternal Grandmother "has stood in *loco parentis* for a period of approximately six and one half years." Trial Court Op., dated 10/7/15, at ¶24.

Children spent their weekend days with Mother until January 2014 when Mother told them to tell Maternal Grandmother not to bring them around because she was being evicted. Thereafter, Mother did not call, show

- 3 -

up at Maternal Grandparents' home, or send cards to Children. Maternal Grandmother did not know where Mother had gone and had no telephone number through which to contact her. Mother has had no contact with Children since January 2014.

On October 22, 2014, Maternal Grandparents, as proposed adoptive parents, filed three Petitions for Involuntary Termination of Parental Rights and a Petition to Change the Goal to Adoption for all three Children. Because Children had resided with Maternal Grandparents for over six and one-half years, the trial court waived the requirement for a home study.

On July 28, 2015, the trial court held a hearing at which Mother, Father, and Maternal Grandparents testified.[3] At the conclusion of the hearing, the trial court entered its order terminating the parental rights of Mother and Father pursuant to section 2511(a)(1), (2), and (b), and changing Children's permanency goal to adoption.

On August 21, 2015, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issue on appeal.

> Whether the trial court abused its discretion by granting the petition to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), and (2) when the evidence did not establish a "settled purpose to relinquish parental rights" or a refusal to parent because she was remedying her financial position and attempted [to] maintain contact with [the C]hildren

_____

[3] Children were represented by *guardian ad litem* Randy Wisnouse, Esq.

- 4 -

despite significant obstacles created by [Maternal Grandparents]?

Mother's Brief at 5.[4]

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

---

[4] Mother did not raise a challenge to the trial court's change of goal to adoption in her Pa.R.A.P. 1925(b) Statement or in her Statement of Questions Involved in her brief. Any argument pertaining to Children's permanency goal change is, thus, waived. *See* Pa.R.A.P. 302(a).

The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).

If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

In terminating Mother's parental rights, the trial court relied upon Sections 2511(a)(1),(2), and (b) of the Adoption Act, which provide, in relevant part, as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \*    \*    \*
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> > \*    \*    \*
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), … the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

This Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her

- 7 -

conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

- 8 -

J-S08030-16

Appellant avers that since January 2014, she has faced major hurdles, preventing her from caring for Children, such as homelessness, unanswered phone calls and text messages by Maternal Grandmother and her half-sister, a strained relationship with Maternal Grandparents, and no transportation to visit Children. Appellant's Brief at 13-14. Mother contends that she reasonably resisted these obstacles, but she was unable to maintain contact with the Children despite her best efforts and desire to do so. *Id.* at 14. Accordingly, Mother posits that the evidence did not establish that she deliberately relinquished her parental rights or continuously refused to parent. *Id.* at 14-15.[5]

At the termination hearing, Maternal Grandmother testified that, since January 2014, Mother has not visited Children, contacted Children, or sent Children any birthday cards, gifts, or letters. N.T., 7/28/15, at 9, 31. Maternal Grandmother further testified that, since January 2014, Mother has not contacted Grandparents to resume her visitation with Children, and has not provided any financial support. *Id.* at 13.

Maternal Grandmother also testified that Children refer to Mother and Father by their first names, while they call Maternal Grandmother "Mom" or "Grandma," and refer to Maternal Step-Grandfather as "Dad" or "Pap." She

---

[5] Mother also argues that the trial court failed to consider that there was a reasonable prospect of reunification as she works full time now and is close to securing a home. Appellant's Brief at 14-15. As noted above, Mother did not raise this argument before the trial court. It is, thus, waived. Pa.R.A.P. 302(a). *See supra*, n.4.

- 9 -

also stated that Maternal Aunt and Children have a sibling relationship. Maternal Grandmother further testified that she and Maternal Step-Grandfather have taken Children to doctor's appointments, attended school conferences, and provided for their physical, financial, and emotional needs. Maternal Grandmother stated that she believed it would be in Children's best interests to terminate Mother's and Father's parental rights because contact with them is "erratic. They're in their life one day and gone for six months[, a] year." *Id*. at 23.

Maternal Step-Grandfather testified that he and Maternal Grandmother attend S.M.C.'s and D.K.C.'s cheerleading practices and J.M.C.'s football events, while Mother and Father have not attended any of their daughters' cheerleading practices or their son's football games. *Id.* at 55-56, 70.[6]

Mother testified that she discontinued her visitations with Children in January 2014 because she lost her mobile home and moved into a homeless shelter. *Id.* at 91-92. Mother stated that, when she obtained another apartment, she tried contacting Maternal Grandmother, Maternal Aunt and CYS investigator, Mary Mock, but received no response. *Id.* at 93, 96. Mother further testified that she did not seek to modify custody prior to the termination hearing because she could not afford a lawyer. *Id.* at 108.

---

[6] Maternal Step-Grandfather admitted that CYS investigated him for paddling Mother when she was twelve or thirteen, but claimed the allegation of abuse was unfounded. *Id.* at 61.

Mother admitted that, since January 2014, she has not sent any gifts, cards, or money to Children. *Id.* at 110. Mother also acknowledged that she does not know how the Children are doing in school, or if there are any medical concerns afflicting the Children. *Id.* at 109.

Mother further testified that she currently works full-time as a hotel housekeeper and, although currently homeless, she is on the waiting list to get into an apartment at Village Way. *Id.* at 73-74, 106, 120. Mother admitted that two months prior to the termination hearing, she was arrested and charged with possession or manufacture of controlled substances and criminal use of communication device. She acknowledged that those charges were still pending as she had not yet entered a plea. *Id.* at 111.

At the close of testimony, the *guardian ad litem* stated:

After my appointment at one of the prior hearings, I did have the opportunity to meet with all three children. At that time I met with them initially as a group, and subsequently individually.

Each of the children expressed love for the grandparents and a desire to stay with the grandparents. They knew that they had a mother and father out there in the world, but they couldn't understand their circumstances.

They knew that there was some incarcerations involved. They knew that they spend a night with Mommy at a friend's house some many months ago. …

I believe that given the totality of the circumstances, the residences of the mother by my count, 13 different residences since the move back to Pennsylvania, and in anticipation of an adoption hearing to terminate her parental rights, she appears as homeless today.

- 11 -

> … [Father] testified that he lost track of the natural mother. Even he couldn't keep up with her whereabouts … and [she] could not even keep a cell phone to maintain contact … due to nonpayment of the cell phone bill.

N.T. at 175-76.

The trial court granted Maternal Grandparents' petitions to terminate Mother's and Father's parental rights, observing that although there had been periods when Mother "did step up to the plate," the evidence showed that Mother had not satisfied her role as a parent for a period approaching eighteen months. Trial Ct. Op. at 11; *see also* N.T., 7/28/15, at 179-80. The trial court found that, notwithstanding her poverty and work schedule, Mother presented no excuse as to why she could not exhibit even a "shred of interest" in the Children. Trial Ct. Op. at 11. "She just hasn't given the [c]ourt any reason to believe that she has any interest other than appearing here today because we appointed counsel for her to help her with her defense of this petition." N.T. at 181.

The trial court further found Mother's testimony to be wholly incredible and self-serving. Trial Ct. Op. at 15. The court observed that Mother took no responsibility for her failure to resume her parental obligations, instead blaming Maternal Grandparents, who have been there for her and the Children since she moved back to Pennsylvania. *Id.* The trial court found there was no evidence that Maternal Grandparents placed any barriers upon her showing up at their house to spend time with the Children. *Id.* at 12. The trial court noted that, while there was testimony that Mother might have

had issues with Maternal Step-Grandfather, there was no testimony that Mother was not welcome in their home. *Id.*

The trial court also gave no weight to Mother's testimony that her failure to return to the custodial home of the Children was the result of her concern for Maternal Step-Grandfather's abusive behavior as she took no legal action of any kind to protect the Children from this alleged abuse. *Id.* at 14. The trial court concluded that, for the past eighteen months, Mother simply refused to "swallow[ ] her pride," go to Maternal Grandparents' house, and do "[a]nything that would show that she had some interest" in being part of the Children's lives. *Id.* at 15; N.T., 180-81.

The trial court also noted that but for Maternal Grandparents, the children would have been in the custody of Children and Youth Services. *N.T.* at 180. It observed that Children have been in a nurturing environment with Maternal Grandparents for many years and that they are doing well. *Id*. at 181. Significantly, the trial court stated:

> [Maternal Grandparents] have been there day in and day out for the children who have thrived in their custody and care. They refer to the Petitioners as "mommy" and "dad" as the custody court found them to be *in loco parentis* for the last 6 and ½ years. The children's physical, emotional, and educational well-being have been maintained by the Petitioners as they have been nurtured in their care. The best interests and welfare of the children are best served by allowing Petitioners to fulfill the role as adoptive parents in this case.

Trial Ct. Op. at 14 (unpaginated)

After our careful review, we conclude that the trial court's findings of fact and credibility determinations are supported by the record. As we stated in **In re Z.P.**, 994 A.2d 1108 (Pa. Super. 2010), a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **Id.** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." **In re B., N.M.**, 856 A.2d at 856.

We affirm the order terminating Mother's parental rights on the basis of Section 2511(a)(1) and (b) of the Adoption Act, and changing Children's permanency goal to adoption under section 6351 of the Juvenile Act.[7]

Order affirmed.

---

[7] Mother did not challenge the trial court's determination that termination of her parental rights would be in the best interests of Children. We nonetheless have reviewed the record carefully, and conclude that the trial court's determination as to Section 2511(b) is supported by the evidence. Although the trial court did not conduct a formal bonding analysis, it properly relied on Grandmother's testimony that Mother has not made any contact with Children since January 2014, Children do not ask about Mother, and Children look to Grandparents to have their needs met in concluding that the Children do not have a meaningful bond with Mother. **See** Trial Court Opinion at ¶¶29, 32. We note that the *guardian ad litem* has not appealed the trial court's determination.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/22/2016